**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RUDY MONTANO,

                Plaintiff,

v.	Civ. No. 03-1177 JH/RHS

CITY OF ALBUQUERQUE,

                Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment [Doc. No. 43]. In this case, Plaintiff Rudy Montano ("Plaintiff" or "Montano") alleges that his employer, the City of Albuquerque ("the City"), unlawfully discriminated against him and retaliated against him in violation of federal and state law. The primary issue before the Court is whether there is a genuine issue of material fact as to each of Plaintiff's seven legal claims. After a review of the briefs, exhibits, and applicable law, the Court concludes that the motion should be granted with regard to Plaintiff's claims under Title VII and under Section 1983, granted with regard to Plaintiff's claim for breach of contract, and denied as to Plaintiff's remaining state law claims. Having disposed of all claims over which it has original jurisdiction, in accordance with 28 U.S.C. § 1367(c)(3) the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## FACTS

The Court views the facts in the light most favorable to the Plaintiff. Unless otherwise noted, the following material facts are undisputed.

Montano has worked for the City since 1989, when he was hired by the Corrections

Department. During the period of time relevant to this case, Montano was "Food Service Supervisor" at the Westside jail facility in Albuquerque. Raul Griego, the "Food Service Unit Manager" for the Metropolitan Detention Center, was Plaintiff's direct supervisor. Major Don Crutchfield supervised Griego, and John Dantis supervised Crutchfield.

Problems began to arise in early 2000, when Plaintiff complained that the special dietary requirements of inmates at the Westside jail were not being met. On February 17, 2000, Montano sent a memo to Captain Mike Archuleta stating that the needs of inmates with special diets could not be met at the Westside facility and that those inmates should be housed at the main jail. The following day (February 18), Griego inspected the food service facility supervised by Plaintiff at the Westside jail. Griego noted several problems, including necessary repairs, unclean sink, problems with food and chemical storage, and an incomplete temperature log.

Two weeks later, Andrew Sanchez, "Safety Specialist", conducted a safety audit at the Westside facility, where he noted several safety issues. Plaintiff was not present for Sanchez's audit. On March 6, 2000, Sanchez wrote a memo to Griego documenting his inspection. In that memo, Sanchez stated that the "Food Service Supervisor was in his office reading a newspaper while an inmate was performing his assigned task." The memo as originally written by Sanchez did not mention this individual by name, but Plaintiff objected because he thought that the memo implied that he had been reading the newspaper, when in fact he was not even at work that day. Sanchez later amended his memo to clarify that it was another employee that had been reading the newspaper. The City did not discipline Plaintiff for the problems noted in either Griego's inspection or Sanchez's safety audit.

Also in early 2000, Plaintiff and other food service employees were investigated for

participating in an illegal pyramid scheme. Plaintiff received a reprimand for his participation, but he suffered no loss of pay or grade as a result. In his deposition, Plaintiff admitted that his participation was improper, and that the discipline he received was appropriate.

On March 13, 2000, Plaintiff wrote a letter to Major Crutchfield in which he reiterated his concerns about the needs of inmates on special diets and demanded an apology from Sanchez for "slandering his name" by stating in his audit report that the Food Service Supervisor had been reading the newspaper while on duty. Plaintiff also stated that he would not tolerate being harassed every time he reported a "discrepancy" on behalf of employees and inmates. After hearing Plaintiff's complaints, Griego instructed him to provide Griego with the necessary special diet orders so that he could ensure that inmates received the appropriate diets. Plaintiff does not remember providing the diet slips to Griego, and Griego contends that he never received them. There is also a factual dispute regarding whether it was Plaintiff's duty to prepare written diet slips. However, Plaintiff alleges that Griego already had all the information he needed to provide the special diets and did not need the written diet slips. Plaintiff also contends that sometime in March of 2000, Griego called him and said that he had "friends in high places" and "anyone who crossed him has either been fired, or he finds ways to get rid of them."[1] Plaintiff does not recall how many such phone calls there were or when they took place, nor did he make any written record of the calls.

In April of 2000, Griego delivered cold cuts to the Westside facility. As Plaintiff assisted Griego in unloading the coldcuts from the truck, Plaintiff noticed that the cold cuts were past the date

---

[1] According to his deposition testimony, Plaintiff does not recall when he received these calls or how many there were. Although he admits that he did not complain about the phone calls in writing, Plaintiff claims to have reported them to Major Crutchfield. Plaintiff does not recall Crutchfield's response. Griego denies that these phone calls ever took place.

marked on their packaging. Griego told Plaintiff to serve the food to inmates anyway. Although it is not clear from the record, apparently Plaintiff refused to serve the cold cuts, which ultimately were returned to the manufacturer for a full refund.

At some point during the year 2000, Plaintiff began feeling ill, which he attributes to job-related stress. From approximately October 23, 2000 until November 10, 2000, Plaintiff took a medical leave of absence for stress. On some unspecified date during this time frame, Montano met with Crutchfield and Griego, who he claims threatened to discipline or fire him if he ever wrote a letter to upper management airing his complaints. On December 29, 2000, Plaintiff wrote again to Major Crutchfield, stating that he had been "targeted" because "in the past [he] reported some negligence on behalf of [his] supervisor." Plaintiff also implied that the investigation of his participation in the pyramid scheme was improper. He also asked Crutchfield to "speed up" the investigation and to help him transfer to another department. In this letter Montano does not mention that he feels he is being discriminated against based upon his national origin. Then, sometime in January or February of 2001, Montano took another leave of absence for job-related stress.

Some employees in the food service department are unionized. In May of 2001, the union representative contacted Griego and informed him that union employees' overtime and leave requests were not being handled in accordance with the union contract. Subsequently, Griego instructed food service employees to submit their overtime and leave requests to him for approval so that he could ensure compliance with the union contract, at which point the union grievance was resolved. This meant that Montano no longer had final authority to handle the overtime and leave requests of employees under his supervision. However, Montano was still responsible for checking his employees' time sheets to ensure that they accurately reflected the time worked.

4

In June of 2001, Griego wrote a memo to Crutchfield requesting that Plaintiff receive a 10% salary increase. Ultimately Plaintiff did not receive the pay increase, although the record contains no evidence as to the reason the increase was not approved.

On September 4, 2001, Plaintiff wrote a memo to Joyce Rodarte of the Human Services Department in which he requested medical leave and asked to be transferred to another department within the City. In that memo, Plaintiff does not say that he believes he suffered discrimination because of race or national origin, but rather that he had suffered retaliation for refusing to serve outdated food. In fact, there is no evidence in the record that Plaintiff ever complained to anyone during his tenure at the Corrections Department that he believed he was being discriminated against on the basis of his national origin.

Another issue that arose during the course of Plaintiff's employment with the Corrections Department was whether Plaintiff was improperly denied "upgrades." An "upgrade" occurs when an employee is temporarily promoted to a position with more authority during a supervisor's absence. It is undisputed that on August 9, 2000, Griego offered Plaintiff an upgrade for a period of three days while Griego was out of the office. Plaintiff claims that he was improperly denied upgrades, and that employees with less seniority were upgraded over him. There is no information in the record regarding how many times Plaintiff was denied the opportunity for an upgrade. However, there is evidence in the record that Plaintiff turned down offers to be temporarily upgraded during short absences by Raul Griego because he was not paid extra for the additional responsibility required by a temporary upgrade. In addition, the record reveals that under the City's merit system ordinance and union contract, no non-union employee of Plaintiff's classification is entitled to additional pay for a temporary upgrade unless that upgrade is for a term of 45 days or longer. It is undisputed that none

5

of the upgrades offered to Plaintiff or any other food service employee was more than 45 days. In addition, the evidence in the record shows that when Plaintiff refused upgrades, then less senior employees were offered the upgrade opportunities, and that some of those employees were Hispanic.

In October of 2001, Montano transferred to the City's Animal Services Department. No one asked him to leave the Corrections Department; rather, he transferred of his own accord. Plaintiff has the same salary and benefits as he did when he worked in the Corrections Department. However, Plaintiff now has less opportunity to earn overtime compensation than he did while working in the Corrections Department.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

## I.      DISCRIMINATION UNDER TITLE VII (Count I)

In order to survive a motion for summary judgment, Plaintiff must meet his initial burden to show that his employer discriminated against him because of his national origin through either direct or indirect evidence. Direct evidence is "proof of an existing policy which itself constitutes discrimination," *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996), or "oral or written statements on the part of a defendant showing a discriminatory motivation." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). It does not appear that Plaintiff claims to have direct evidence of discrimination in this case.

In the absence of direct evidence, Plaintiff may utilize indirect evidence. In that case, Plaintiff must establish a prima facie case of national origin discrimination by showing (1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once an employee carries his burden of demonstrating a prima facie case, the burden of production shifts to the employer to demonstrate "some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.*; s*ee Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer offers a nondiscriminatory reason, the burden shifts back to the employee to show that there is a genuine dispute of material fact as to whether the employer's reason for the challenged action is pretextual and unworthy of belief. *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir. 1994).

Plaintiff has failed to come forward with any evidence to support the third prong of his prima facie case: that similarly situated employees received different treatment than that which he received.

In fact, Plaintiff has failed to identify a single similarly situated employee who received better treatment than he did. Counsel for the City questioned Plaintiff extensively at his deposition regarding whether he had a fellow employee who was of a different national origin who was treated better than he was, and Plaintiff said that he could not name such a person. Montano Depo., Defendant's Ex. A, at pp. 244-251. Furthermore, in his written response to the motion for summary judgment, Plaintiff fails to point to evidence that any other similarly situated, non-Mexican American employee was treated differently. In his response brief, Plaintiff offers only the conclusory statement, "Plaintiff has stated that he was the only Mexican-American employee treated in this manner."[2] However, conclusory allegations not supported by evidence are insufficient to resist summary judgment. *See Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 853 (10th Cir. 1996).

" 'As the very name prima facie case suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a legally mandatory, rebuttable presumption.'" *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 558 (10th Cir. 1996) (quoting *O'Connor v. Consolid. Coin Caterers Corp.*, 517 U.S. 308, 311-12, 116 S.Ct. 1307 (1996)) (further quotation omitted) (emphasis added). In this case Plaintiff has come forward with absolutely no evidence to support an inference that his experiences working at the Westside facility were a result of illegal discrimination against him based on his national origin.[3]

---

[2] Plaintiff offers no citation to his deposition testimony as support for this statement. Further, the portions of the deposition transcript reviewed by the Court do not support this interpretation of Plaintiff's testimony.

[3] The Court also expresses doubt that Plaintiff has come forward with sufficient evidence to created a genuine issue of material fact as to whether he suffered an adverse employment action. However, having found that Plaintiff has not satisfied the third element of his prima facie case, the Court need not reach this issue. Similarly, the Court need not turn to the questions of the existence of a legitimate, non-discriminatory reason for Defendant's actions or pretext.

Accordingly, summary judgment will be granted in favor of the City.

## II.     RETALIATION UNDER TITLE VII (Count II)

Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1267 (10th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)).  In order to succeed on a claim of retaliation under Title VII, a plaintiff must show: (1) he engaged in protected opposition to statutorily prohibited discrimination; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005); *Trujillo v. University of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

Plaintiff cannot show that he has engaged in any protected opposition to prohibited discrimination. The undisputed facts are that during the entire course of his employment with the Corrections Department of the City, Plaintiff never told any of his supervisors that he thought he was being treated unfairly because of his national origin, and he never filed a grievance or other complaint alleging discrimination. Plaintiff never testified regarding discrimination. In addition, there is no evidence that Plaintiff did anything to oppose unlawful discrimination, either on behalf of himself or on behalf of another. Furthermore, on September 4, 2001, when Plaintiff requested sick leave and transfer to a different department within the City, he stated that he had been retaliated against for reporting his supervisor, Raul Griego, for trying to serve outdated cold cuts. Plaintiff made no mention of discrimination on the basis of national origin. Defendant's Ex. 37. Rather, Plaintiff asserted that he had been retaliated against for refusing to serve outdated meat to inmates. Id.

9

Again without citation to the evidence, Plaintiff argues that he engaged in protected activity by (1) complaining to the City about serving outdated food and failing to meet the needs of inmates with special diets; and (2) complaining to Major Crutchfield "about the way in which Mr. Griego was treating him." As to the first allegedly protected activity, it is not of the type covered by Title VII, which prohibits retaliation against employees who oppose the type of discrimination forbidden by Title VII, e.g. discrimination based upon race, sex, color, national origin, and religion. *See* 42 U.S.C. § 2000e-2. Though this type of protest might be protected by other laws, such as state whistleblower statutes or common law wrongful discharge, it does not satisfy the criteria for retaliation under Title VII.

As to Plaintiff's second activity, it is undisputed that Plaintiff did not complain to his supervisors that he had suffered differential treatment based upon his national origin. Although Plaintiff did complain about the way he was being treated, he never informed anyone that he believed that treatment was related to his national origin. Because he did not inform the City that discrimination was occurring, Plaintiff was not opposing discriminatory conduct prohibited by Title VII. To do so, a plaintiff need not file formal charges of discrimination, testify in a legal proceeding, participate in an investigation or formally complain to management about the alleged unlawful conduct (although all of these activities would suffice). Protected opposition may consist of nothing more than making informal protests, voicing complaints to the employer or using an employer's grievance procedures. Central to these examples is the element of "speaking out" against the unlawful employment practice. This reporting or "speaking out" requirement is logical because the anti-retaliation provisions of Title VII are intended to encourage employees to call to their employers' attention the discriminatory practices about which the employer may be unaware. *See Berg v. La*

*Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980). However, Plaintiff did not bring the alleged discrimination to his employer's notice. Therefore, Defendant's motion for summary judgment will be granted.

### III.   EQUAL PROTECTION AND MUNICIPAL LIABILITY UNDER SECTION 1983 (Counts VI and VII)

The Plaintiff argues that the City violated his constitutional right to equal protection under the "class of one" doctrine of equal protection. Viable equal protection claims may be brought by a "'class of one,' where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To succeed on such an equal protection claim, Plaintiff must prove that he was singled out for persecution due to some animosity, meaning that the actions of the City were a spiteful effort to get him for reasons wholly unrelated to any legitimate state activity. *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotation omitted). In addition, Plaintiff must prove that he was treated differently than those similarly situated. *See id.*

Plaintiff's equal protection claim suffers from the same deficiency as his claim for national origin discrimination. Simply stated, Plaintiff has failed to come forward with any evidence to show that similarly situated employees received different treatment than that which he received. In the absence of such evidence, he cannot show that he comprises a "class of one" in accordance with *Olech*.

Because Plaintiff's federal statutory and constitutional claims have failed, there is simply no basis upon which to hold the City liable under 42 U.S.C. § 1983. Accordingly, the City is entitled

11

to summary judgment on the Plaintiff's claims for violation of his constitutional right to equal protection and his claim for liability under Section 1983.

## IV.     BREACH OF CONTRACT (Count III)

In Count III of his complaint, Plaintiff alleges that the City breached his contract of employment. However, in his response to the motion for summary judgment, Plaintiff agreed that his claim for breach of contract should fail. Accordingly, summary judgment will be entered in favor of Defendant on this claim by stipulation of the Plaintiff.

## V.      REMAINING STATE LAW CLAIMS: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AND WRONGFUL DISCHARGE (Counts IV and V)

Having dismissed all claims on which the Court had original federal jurisdiction, the Court, under 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the remaining state law claims. *See Pruitt v. Comcast Cable Holdings, LLC*, 100 Fed. Appx. 713, 717, 2004 WL 1226935 (10th Cir. June 3, 2004) (unpublished decision) (holding that the district court's refusal to exercise supplemental jurisdiction over plaintiff's state law contract claims after dismissing all federal claims was "clearly authorized under 28 U.S.C. § 1367(c)(3)"). Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, [a] district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A district court, however, "may decline to exercise supplemental jurisdiction . . if[:]"

>   (1) the claim raises a novel or complex issue of State law,

>   (2) the claim substantially predominates over the claim or claims over

>which the district court has original jurisdiction,
>
>(3) the district court has dismissed all claims over which it has original jurisdiction, or
>
>(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The third provision applies to this case. The Court has dismissed all claims on which it had original jurisdiction—the national origin discrimination and retaliation claims, as well as the constitutional claims. The remaining claims—breach of contract and wrongful discharge—arise from state law.

The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it. In *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), decided more than twenty years before Congress passed 28 U.S.C. § 1367, the Supreme Court addressed the federal district courts' ability to exercise jurisdiction over state law claims. In explaining that such power existed, the Supreme Court noted that it "need not be exercised in every case in which it is found to exist." *Id.* at 726. The Supreme Court continued:

>Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.* (footnotes omitted). *See Bd. of County Comm'rs of Sweetwater County v. Geringer*, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002) ("[T]he district court's ruling [in which it declined to review the state law claims] comports with our general admonishment that district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial . . . .").

13

The dismissal of his state law claims without prejudice will not prejudice Plaintiff, because under 28 U.S.C. § 1367(d), he has 30 days in which to re-file his state law claims in state court.[4] As the Supreme Court explained: "To prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court, § 1367(d) provides a tolling rule that must be applied by state courts." *Jinks v. Richland County, South Carolina*, 538 U.S. 456, 459, 123 S.Ct. 1667 (2003). Accordingly, Plaintiff's claims for wrongful discharge and breach of the implied covenant of good faith and fair dealing will be dismissed.

## V.  REQUEST TO AMEND THE COMPLAINT

In the final paragraph of Plaintiffs' Response to Defendants' Motion for Summary Judgment [Doc. No. 46], the Plaintiff makes the following statement: "In addition or in the alternative, Plaintiff respectfully requests that this Court grant Plaintiff leave to amend his Complaint to include a claim for a First Amendment violation, Constructive Discharge, and possibly name individual Defendants . . ." This is not the proper way to make a request to amend Plaintiff's Complaint. Local Rule 7 (D.N.M.LR-Civ. 7) sets forth the requirements for motion practice in the District of New Mexico. Therefore the Court will not consider Plaintiff's request at this time.

**IT IS THEREFORE ORDERED** that:

(1)   Defendant's motion for summary judgment is **GRANTED** on Plaintiff's claims under Title VII (Counts I and II), 42 U.S.C. § 1983 (Count VI), and the equal protection clause (Count VII);

(2)   Defendant's motion for summary judgment is **GRANTED** on Plaintiff's claim for breach

---

[4] 28 U.S.C. § 1367(d) provides: "The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

of contract (Count III); and

(3) Defendant's motion for summary judgment on Plaintiff's remaining state law claims for breach of the implied covenant of good faith and fair dealing and wrongful discharge(Counts IV and V) is **DENIED**; however, the Court declines to exercise supplemental jurisdiction over those claims, and they will be **DISMISSED WITHOUT PREJUDICE**.

_____
UNITED STATES DISTRICT JUDGE